ASJZ: USA02015R00184

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | |
|---|---|
| UNITED STATES OF AMERICA | * |
| | * UNDER SEAL |
| v. | * CRIMINAL NO. RDB-16-0430 |
| | * |
| MAHMOOD HUSSAIN SHAH | * (Food Stamp Fraud, 7 U.S.C. § 2024(b); |
| and MUHAMMAD RAFIQ, | * Wire Fraud, 18 U.S.C. § 1343; Aiding |
| | * and Abetting, 18 U.S.C. § 2; Forfeiture, |
| Defendants | * 18 U.S.C. §§ 981(a)(1)(C), 21 U.S.C. |
| | * § 853, 28 U.S.C. § 2461(c)) |
| | * |

\*\*\*\*\*\*

## INDICTMENT

### COUNT ONE
(Food Stamp Fraud)

The Grand Jury for the District of Maryland charges that:

### Introduction

At all times relevant to this Indictment:

1. Defendant **MAHMOOD HUSSAIN SHAH** ("SHAH") was a resident of Maryland.

2. Defendant **MUHAMMAD RAFIQ** ("RAFIQ") was a resident of Maryland.

### The Food Stamp Program/Supplemental Nutrition Assistance Program

3. Congress passed the Food Stamp Act of 1977, which was later renamed the Supplemental Nutrition Assistance Program ("SNAP"), in an effort to alleviate hunger and malnutrition. The program used federal tax dollars to subsidize low-income households, which permitted those households to obtain a more nutritious diet by increasing the food purchasing power of eligible persons. SNAP was jointly administered by the United States Department of Agriculture ("USDA") and the Food and Nutrition Service ("FNS") together with various state agencies.

4. Title 7 of the Code of Federal Regulations, Section 278.2(a), prohibited an authorized retail food store from accepting food stamp coupons in exchange for cash. Further, Title 7 of the Code of Federal Regulations, Sections 278.2(a) and (h) provided that food stamp coupons may "only be accepted from eligible households or the households' authorized representative, and only in exchange for eligible food." Title 7 of the Code of Federal Regulations, Section 271.2 provided that food stamp coupons included "an electronic benefit transfer card or personal identification number issued pursuant to the provisions of the Food Stamp Act of 1977, as amended, for the purchase of eligible food."

5. In Maryland, SNAP was administered by the Maryland Department of Human Resources ("DHR") and was known as the Food Supplement Program ("FSP"). Maryland implemented FSP, funded by SNAP, through an Electronic Benefits Transfer ("EBT") system. FSP customers were issued plastic EBT Cards which contained an embedded magnetic stripe that stored basic information required for food purchases. Retailers approved by FNS to accept SNAP were assigned an FNS authorization number and, in some cases, were provided with a point of sale ("POS") device to access the electronic funds allocated to customer's EBT Cards. POS devices communicated with the Maryland EBT central database to debit a customer's available SNAP benefit balance for the cash value of eligible food items purchased.

6. Under the FSP, benefits were automatically added to a recipient's EBT Card on a monthly basis. When an EBT Card was swiped through a retailer's POS terminal, the swipe caused an electronic transmission of information through a series of network switches to the central Maryland EBT database located in Texas, which contained customer account balance information. The EBT contractor verified the retailer was authorized to conduct SNAP EBT transactions. The Maryland EBT system verified the amount of benefits available, authorized

the transaction, and deducted the purchase amount from the customer's available balance. The system also calculated cumulative FSP sales for each retailer and authorized electronic payments to the retailer's bank account.

7. Once the EBT was approved, information flowed back to the POS terminal and the store employee received confirmation that the cardholder's account had been successfully debited. FSP EBT transactions were made for the exact amount of the sale and no change was given to the cardholder. SNAP reimbursements were paid to authorized retailers through a series of electronic funds transfers. On a daily basis, the EBT contractor, located in Austin, Texas, reconciled accounts for participating SNAP retailers in Maryland.

8. In order to participate in the SNAP as an authorized retailer, a business submitted FNS Form 252, Food Stamp Program Application for Stores to FNS. As part of that application, the store owner/manager certified that they understood and agreed that "trade[ing] cash for Supplemental Nutrition Assistance Program benefits" was a "violation" of SNAP regulations.

9. In order to receive SNAP reimbursements, authorized retailers were required to establish a single authorized bank account, approved by FNS, into which EBT benefits from legitimate food stamp transactions would be deposited.

### Shah's Participation in the Food Stamp Program

10. Shahkahn, Inc., d/b/a Corner Groceries, was a convenience store located in Baltimore, Maryland. **SHAH** was the owner/manager of Corner Groceries.

11. **RAFIQ** was an employee of Corner Groceries.

12. On or about September 11, 2007, **RAFIQ** submitted an FNS 252 for Harford Citgo, located at 2330 Harford Rd., Baltimore, Maryland. As part of the application, **RAFIQ** certified that he understood the Food Stamp Program rules, as well as acknowledged that

violations of program rules can result in "fines, legal sanctions, withdrawal, or disqualification from the Food Stamp Program." Harford Citgo was subsequently licensed by FNS to participate in the food stamp program.

13. On or about December 11, 2009, **SHAH** submitted an FNS Form 252 for Corner Groceries to FNS. As part of that application, **SHAH** submitted a form certifying that he understood that it was a "violation" of SNAP regulations to "trade[] cash for Supplemental Nutrition Assistance Program benefits."

14. On or about January 7, 2010, Corner Groceries was licensed by FNS to participate in the food stamp program as a SNAP retailer.

15. On or about May 26, 2011, Harford Citgo voluntarily withdrew from the food stamp program.

16. From in or about October 2010 through August 2016, **SHAH, RAFIQ**, and others unknown to the Grand Jury routinely redeemed and caused to be redeemed EBT benefits in exchange for cash in violation of the food stamp program rules and regulations. As a result of these unlawful cash transactions, **SHAH** and **RAFIQ** received at least $1,610,556.94 in EBT deposits for food sales that never actually occurred or were substantially inflated. **SHAH** and **RAFIQ** knew that exchanging cash for EBT benefits was in violation of the laws, rules and regulations regarding the food stamp program and that they were consequently were not entitled to the EBT deposits made by FNS into the Shahkahn, Inc. accounts.

## The Charge

17. From in or about October 2010 through in or about August 3, 2016, in the District of Maryland and elsewhere, the defendant,

**MUHAMMAD RAFIQ**

4

did knowingly use, transfer, acquire and possess food stamp coupons, through EBT Cards, having a value in excess of $100 in a manner contrary to the Food Stamp Act (Title 7, United States Code Section 2011, et seq.) and the regulations issued pursuant to that program, that is, defendant **MOHAMMAD RAFIQ** redeemed beneficiaries' electronic benefits for cash, as follows:

| DATE | EBT TRANSACTION AMOUNT | STORE |
|---|---|---|
| February 10, 2015 | $61.39 | Corner Groceries |
| March 13, 2015 | $75.82 | Corner Groceries |
| May 15, 2015 | $64.87 | Corner Groceries |
| July 9, 2015 | $42.98 | Corner Groceries |
| October 19, 2015 | $63.95 | Corner Groceries |

7 U.S.C. § 2024(b)(1)
18 U.S.C. § 2

## COUNTS TWO THROUGH SEVEN
### (Wire Fraud)

The Grand Jury for the District of Maryland further charges that:

1. Paragraphs 1 through 16 of Count One are incorporated here.

### The Scheme to Defraud

2. From in or about October 2010 through in or about August 2016, in the District of Maryland, the defendants,

**MAHMOOD HUSSAIN SHAH** and
**MUHAMMAD RAFIQ**

knowingly and willfully devised and intended to devise a scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, and promises, and material omissions from SNAP, a federally funded national malnutrition program jointly administered by USDA and FNS, together with various state agencies ("the scheme to defraud").

### The Object of the Scheme to Defraud

3. It was the object of the scheme to defraud that **SHAH** and **RAFIQ** would debit funds from EBT Cards and pay the individual who had presented the EBT Card in cash at less than full value. Typically, **SHAH** and **RAFIQ** paid the individual who had presented the EBT Card half the value of the amount they had debited in cash. By executing the scheme to defraud, **SHAH** and **RAFIQ** received at least $ 1,610,556.94 in EBT deposits for food sales that never actually occurred or were substantially inflated.

## Manner and Means of the Scheme to Defraud

4. It was part of the scheme to defraud that **SHAH** created a Maryland corporation for the purpose of operating a convenience store that participated in the SNAP program in Baltimore, Maryland.

5. It was further part of the scheme to defraud that **SHAH** applied to participate in the SNAP program.

6. It was further part of the scheme to defraud that Corner Groceries was authorized to participate in the SNAP program.

7. It was further part of the scheme to defraud that **SHAH** and **RAFIQ** caused a USDA EBT point of sale device in Maryland to electronically transmit interstate requests to authorize transactions and deduct amounts from EBT customers' available balances for unauthorized and unlawful purposes.

8. It was further part of the scheme that **SHAH** and **RAFIQ** caused the Maryland EBT System (through the EBT contractor) to electronically transmit an interstate signal that authorized electronic payment to the bank account of Corner Groceries. Once the transaction was approved, information flowed back to the POS terminal confirming that the cardholder's account had been successfully debited.

9. It was further part of the scheme to defraud that in order to avoid detection, **SHAH** and **RAFIQ** debited and caused to be debited funds off an EBT card in multiple transactions over a period of hours or days to disguise the fraudulent nature of the transactions.

10. It was further part of scheme to defraud that **SHAH** and **RAFIQ** falsely and fraudulently redeemed and caused to be redeemed from the United States government the full

amount of the EBT food stamp benefits charged on the EBT cards and caused this money to be deposited into a bank account controlled by **SHAH**.

### The Charges

11. On or about the dates below, in the District of Maryland and elsewhere, the defendants,

**MAHMOOD HUSSAIN SHAH** and
**MUHAMMAD RAFIQ**

for the purpose of executing and attempting to execute the scheme to defraud, did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate or foreign commerce, any writings, signs, pictures or sounds for the purpose of executing such scheme and artifice, that is, the defendants knowingly used and caused to be used a point of sale device inside Corner Groceries to redeem beneficiaries' electronic benefits for unauthorized and unlawful purposes, which caused communications to be sent from that point of sale device in Maryland to Texas, as follows:

| COUNT | DATE | EBT TRANSACTION AMOUNT |
|---|---|---|
| TWO | February 10, 2015 | $61.39 |
| THREE | March 13, 2015 | $75.82 |
| FOUR | May 15, 2015 | $64.87 |
| FIVE | July 9, 2015 | $42.98 |
| SIX | October 19, 2015 | $63.95 |
| SEVEN | August 3, 2016 | $63.75 |

18 U.S.C. § 1343
18 U.S.C. § 2

## FORFEITURE

The Grand Jury for the District of Maryland further finds that:

1. Upon conviction of the offenses in violation of Title 18, United States Code, Section 1343, as set forth in Counts Two through Seven of this Indictment, the defendants,

**MAHMOOD HUSSAIN SHAH** and
**MUHAMMAD RAFIQ**

shall forfeit to the United States, pursuant to Title 18, United States Code, Section 981(a)(1)(C), Title 21, United States Code, Section 853, and Title 28, United States Code, Section 2461(c), any property, real and personal, which constitutes and is derived from proceeds traceable to such violations, including but not limited to a sum of money equal to the value of the proceeds of the scheme to defraud as described in Paragraph 2 of Counts Two through Seven, which amount is at least $1,610,556.94.

### Substitute Assets

2. If, as a result of any act or omission of the defendant, any such property subject to forfeiture:

   a. cannot be located upon the exercise of due diligence;

   b. has been transferred or sold to, or deposited with, a third person;

   c. has been placed beyond the jurisdiction of the Court;

   d. has been substantially diminished in value; or

   e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

18 U.S.C. § 981(a)(1)(C)
21 U.S.C. § 853
28 U.S.C. § 2461(c)

                                          _____
                                          ROD J. ROSENSTEIN
                                          UNITED STATES ATTORNEY

A TRUE BILL:

**SIGNATURE REDACTED**

_8/25/2016_____                _____
Date                                            Foreperson