**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | * | |
| | * | |
| **v.** | * | **CRIMINAL NO. CCB 16-430** |
| | * | |
| **MAHMOOD HUSSAIN SHAH** | * | |
| | * | |
| **Defendant.** | * | |
| | * | |
| | * | |
| | ****** | |

<u>**RESPONSE TO THE DEFENDANT'S MOTION FOR NEW TRIAL**</u>

The United States of America hereby requests the Court deny Defendant Mahmood

Shah's "Motion to Vacate Judgement and For New Trial," ("Def. Mot."). It should be denied as

meritless, and the defendant should proceed to the sentencing for the crimes of which he was

convicted. As the facts demonstrate, counsel was made aware of the existence of the supposedly

suppressed video evidence from the initial discovery productions, and was made aware of the

Government's difficulty in accessing this evidence prior to trial. Moreover, the defendant points

to no basis by which the Court can conclude the evidence was exculpatory. Rather, an

exhaustive review of the video has revealed that the evidence is highly incriminating of the

defendant. Despite his plaintive arguments that the video impeaches a government witness, the

defendant points to no actual instances that prove his supposition. Finally, even if the evidence

may have impeached one of the government's witnesses, the jury had overwhelming evidence

beyond that witness' testimony to conclude beyond a reasonable doubt of the defendant's guilt

on all charges. For these reasons, the Court should not delay justice any further and Mahmood

Shah should proceed to sentencing on January 18, 2019.

## <u>INTRODUCTION</u>

The Court, having reviewed the record in this matter, including the government's Sentencing Reply, is no doubt aware that defendant Mahmood Shah originally appeared before the Honorable Richard D. Bennett and pleaded guilty to wire fraud.  After securing a postponement for his first sentencing date, he moved to withdraw his plea on the date of his second sentencing date.  Judge Bennett denied the motion to withdraw.  The defendant subsequently secured his current counsel, who, concurrent to the defendant's third sentencing hearing, again moved to withdraw the guilty plea.  This motion, which was granted, was based in part on a claim that the Defendant did not grasp the English language – a claim that is now demonstrated to be spurious given the defendant's videotaped confession made in English that was shown during the trial.

The defendant subsequently convinced Judge Bennett to recuse himself, and the case was transferred to the Honorable Marvin G. Garbis, who set a February 2018 trial date.  Counsel was provided with the previously-disclosed discovery, and was given additional discovery as well. Included in the disclosures was documentation that the DVR from the defendant's store was seized.

The trial in this matter, relating to Shah and his partner Muhammad Rafiq illegally selling food stamps for cash, lasted five days beginning on February 18, 2018.  The charges against the defendant consisted of six counts of substantive wire fraud – taking place between February 10, 2015 and August 3, 2016.  Shah was the teller on only one of those dates – the date of August 2, 2016.  For the remainder, the teller was Rafiq.  On February 22, 2018, Shah was convicted of all six counts.  There was no conspiracy charge for the jury to consider, though the jury through their verdict found that there was a scheme to defraud between Rafiq and Shah.

## **LEGAL STANDARD**

The Supreme Court held, in *Brady v. Maryland*, 373 U.S. 83 (1963) that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87.  "Therefore, a Brady violation contains three elements: the evidence was (1) favorable to the accused, (2) suppressed by the government, and (3) material to the verdict at trial." *Nicolas v. Attorney Gen. of Md.*, 820 F.3d 124, 129 (4th Cir. 2016).  "Both information that undermines the prosecution's case and information that supports the defendant's case constitute Brady material that must be disclosed." *Id.*  Evidence is material if there is a "reasonable probability that its disclosure would have produced a different result." *United States v. Parker*, 70 F.3d 550, 558 (4th Cir. 2015) (quoting *United States v. Bartko*, 728 F.3d 327, 340 (4th Cir. 2013)).  This standard does not require a showing that the jury more likely than not would have returned a different verdict. *Id.*  Rather the reasonable probability standard is satisfied if "the likelihood of a different result is great enough to undermine confidence in the outcome of the trial." *Id.*  And, in particular, impeachment evidence may be material when the witness in question "supplied the only evidence of an essential element of the offense." *Id.* (quoting *Bartko*, 728 F.3d at 339.  In contrast, impeachment evidence is not material if it is "cumulative of evidence of bias or partiality already presented and thus would have provided only marginal additional support for the defense. *Id.*

## ARGUMENT

**I.     The evidence counsel complains was "suppressed" from him was evidence of which he was made aware.**

As a preliminary matter, the video surveillance evidence that is the subject of the defendant's motion was not "suppressed."  The defendant complains that, "[t]he government neither provided, showed, or mentioned this new video evidence."  Def. Mot. at 1.  Contrary to this assertion, the evidence was known to the defendant from the government's initial disclosures, and the government's difficulty in accessing that surveillance was further made known to the defendant and his counsel prior to trial.  In response to the notice he received, the defendant never requested to view the surveillance, nor did he make any efforts to assist in accessing it when it became clear that the government could not access it.  The defendant never raised concerns with the trial court about the inability to access the surveillance prior to trial that he now asserts contains exculpatory material.  In truth, these were strategic decisions by counsel, because the evidence on the surveillance footage, as will be laid out in this motion, was highly incriminating of his client.  However, his efforts to now take this surveillance and transform the government's success in accessing it as a *Brady* violation are misleading and inappropriate.

On November 4, 2016, counsel for both defendants Shah and Rafiq were provided a discovery package including DVD #E10, which contained a copy of the search warrant from Corner Grocery at 1242 Darley Avenue.  These documents were bates labeled "SW-000001 – 000051."  Bates label SW-00004 contained a receipt of property for an item described as "Activision Video system s/n: 0811157030073."  Current counsel for defendant Shah received these documents, as evidenced by his December 19, 2017 email to the undersigned stating, "With my respect to my discovery requests, I wanted to let you know what I already have. . . . Ten DVD's marked E 01 thru E 010."  These records are attached in Exhibit A.  On January 8,

2018, counsel was sent additional discovery containing an FBI report bates labeled "R-302-000103 - 000233."  Within this report, the same receipt of property describing the DVR was produced at bates label R-302-000105.  Additionally, a photograph taken at the time of the seizure of the DVR was included at bates label R-302-000202.  These records are attached in Exhibit B.

Counsel for the defendant never inquired if he could review any records from the video system of which he was notified was in the government's possession.  Setting aside the fact that the discovery clearly put him on notice of existence of the surveillance from the search warrant return, surely the defendant was aware of the existence of the video system – *it was his video system*.  Not only was the defendant aware that the government had *his* DVR, the defense also knew the government was having difficulty accessing the contents of DVR prior to trial.  By email dated February 9, 2018, the government sent to counsel the purported *Jencks* material for Special Agent Stanley Wojtkonski.  The file contained 65 pages of emails of Special Agent Wojtkonski.  The first 24 pages of the email, and 44 in all, relate to the difficulty that USDA-OIG was having in accessing the contents of the DVR from the store.

These 44 pages are included as Exhibit C to this motion, and show the chain of frustration from USDA-OIG, regarding accessing this evidence.  For example, on November 20, 2017, Special Agent Wojtkonski asked for a status of the store DVR download.  The response from his technologist was "unfortunately, we have exhausted all options to recover any video directly from this DVR."  The technologist then speculated, "The only option I think we have at this point is to inquire with the company who makes the automated DVR software and request their assistance."  On December 19, 2017, after an inquiry about the DVR from Special Agent Wojtkonski, another technologist responds, "Based on the activity to date, I can safely say if the

trial occurs within the next 60 days, this will not be done in time." Later that same day, Special

Agent Wojtkonski requested agency approval for funding to send the DVR out to the third party

for review. In that email, he states as follows:

> Below is my correspondence with TCD regarding the store DVR needed for
> Corner Grocery (HY-2748-2064) jury trial which is scheduled for February
> 12, 2018 . . . Unfortunately, the store DVR is giving TCD problems and
> they need to send it out to the private company that makes the forensic
> DVR analyzing software TCD uses.

*See* Exhibit C at page 8.

All of these emails were given to defense counsel, who never once inquired

about the contents of the video, his desire to access it, or requested a postponement so

that the contents could be accessed prior to trial. Presumably, as will be discussed

later in this response, this is because the evidence on the DVR turned out to be

overwhelmingly incriminating for his client. The information above establishes that

the defendant was aware of three facts: (1) That the government seized the DVR from

inside his store; (2) That the government was having difficulty accessing the content

of the DVR; and (3) That the government was continuing to make attempts to access

the contents of the DVR. That said, regardless of the contents of the video, it was

equally unavailable to both parties at trial, and counsel was well-aware of its existence

and the circumstances surrounding it. It was not suppressed from him. There is no

*Brady* violation.

**II.     The defendant points to no basis by which the Court can conclude the evidence was favorable to the defendant.  Rather the evidence is highly incriminating of the defendant.**

A review of the contents of the surveillance video demonstrate the absurdity of the defendant's claim that this video could have helped him at trial.  While the government does not believe the Court even needs to consider the contents of the video at issue in this case due to the fact that there was no suppression of the evidence, a review of its contents establishes that the defendant's entire claim is without merit.

The video consists of only four days of in-store surveillance, and agents from the USDA-OIG and the Federal Bureau of Investigation ("FBI") have reviewed the entire contents of the camera that was trained on the checkout counter and teller.  The video shows four employees working at the time of the surveillance, Shah, Rafiq, Mohamad Fayzanali (Rafiq's son), and an unknown male.  The dates are August 25, 2016 to August 29, 2016, which are all *after* the last charged wire fraud count, which took place on August 3, 2016.  The defendant has represented to the Court that, "[m]uch of the video evidence clearly exculpates the Defendant of transactions counted as fraudulent.  The amount of this video evidence which exonerates the Defendant outweighs the video evidence that was used at trial to convict him."  Def. Mot. at 4.  The defendant is wrong.

First, the video shows a total of 142 Electronic Benefits Transfer ("EBT") Supplemental Nutrition Assistance Program ("SNAP") transactions, 65 of which were conducted by the defendant.  Of those 65 transactions, 35 appear to be transactions where food was purchased using food stamps, which totaled $265.41 in food stamp benefit sales.[1]  By contrast, there are 30

---

[1] Some of these transactions appear to include the sale of tobacco products – ineligible to be purchased with food stamps and in violation of the terms of agreement by the defendant, even though it was not charged substantively in this case.

EBT transactions where agents witness what appears to be Shah handing cash across the counter to a food stamp customer.  There is no cash back allowance under SNAP, and these transactions are consistent with the scheme to defraud presented at trial.  These 30 transactions totaled $1,125.88.

The surveillance video shows Muhammad Rafiq completed 20 SNAP transactions, nine of which were in exchange for cash.  The total sale amount for transactions in which cash was exchanged is $228.62.  Mohamad Fayzanali completed 40 SNAP transactions, 17 of which were in exchange for cash. The total sale amount of the cash exchange transactions was $376.09.  The unknown male seen working in the video footage appears to have had no instances where he exchanged cash for food stamps.

As a preliminary matter, it is not exculpatory (or even inconsistent with the evidence at trial) to say that, while the defendant commits crimes sometimes, he did not commit a crime every time he had the chance so he must not be guilty.  No weight of legitimate transactions can legitimize the fraudulent transactions that were shown to the jury.  Moreover, and more to the point, the surveillance showed 30 additional instances of the defendant exchanging food stamps for cash with clients over the course of a mere four days.  This evidence would have been just as devastating to the defendant's trial defense that the government somehow set him up using an "intimidating" undercover agent as it is to his claims now to seek a lighter sentence after conviction.  The cash for food stamp clients are men and women, young and old.  The defendant's modus operandi was to take half of his clients' money and keep it for himself, which means these transactions resulted in the defendant keeping $562 for himself over the course of just four days.

By way of example, the government has submitted video evidence from three of the

transactions that took place while Mahmood Shah worked at the counter on August 26, 2016:

- At approximately 11:14 a.m. a man walks into the store and proceeds directly to the counter. He does not stop to pick up any food products. He hands the defendant his food stamp card. The defendant swipes the card and then manually enters the card number. The man enters his PIN and the defendant opens the register, puts the receipt in, counts four bills and hands them to the man. The man exits the store with no food, only cash. SNAP records show the transaction to have been $8.01.[2]

- At approximately 4:13 p.m., a woman enters the store and walks to the counter. The defendant swipes her card and she appears to enter her PIN. The defendant opens what appears to be a carton of cigarettes and swipes the card again. The woman enters her PIN again and takes the cigarettes from the defendant. Again her card is swiped and she enters the PIN. The defendant then opens the register, removes cash and hands the woman multiple bills. The woman exits. SNAP transaction records show the transaction to have been $24.29.

- At approximately 5:47 p.m. a woman enters the store with her small child and walks directly to the counter. The defendant grabs what appears to be a pack of cigarettes and swipes the woman's card. The woman enters her PIN, and the defendant hands her the cigarettes, opens the register, removes cash and hands it to the woman. The defendant then swipes the card twice and has the woman enter the PIN again before she exits. SNAP records show the transaction to have been $39.06.

A disc containing these videos will be submitted separately as Exhibit D. The following charts

demonstrates all of the defendant's EBT transactions that were completed during the four days of

video footage:

---

[2] Note: upon review, we have learned that there is a time difference of approximately ten minutes and 40 seconds between the surveillance video time stamp and the SNAP transaction record. This was learned by comparing the time marker of the execution of the search warrant to FBI records, as well as additional review of the video.

| DATE | TRANSACTION AMOUNT | CASH BACK? | DATE | TRANSACTION AMOUNT | CASH BACK? |
|---|---|---|---|---|---|
| 08/25/2016 | $2.00 | No | 08/25/2016 | $39.90 | Yes |
| | $2.39 | No | | $10.50 | Yes |
| | $4.43 | No | | $32.95 | Yes |
| | | | | $71.33 | Yes |
| | | | | $61.95 | Yes |
| | | | | $44.75 | Yes |
| | | | | $23.12 | Yes |
| | | | | $51.53 | Yes |
| | | | | $22.50 | Yes |
| 08/26/2016 | $4.28 | No | 08/26/2016 | $58.72 | Yes |
| | $1.69 | No | | $41.70 | Yes |
| | $3.36 | No | | $8.01 | Yes |
| | $9.95 | No | | $10.75 | Yes |
| | $1.00 | No | | $65.50 | Yes |
| | $0.50 | No | | $12.70 | Yes |
| | $3.00 | No | | $31.35 | Yes |
| | $5.70 | No | | $24.29 | Yes |
| | $8.50 | No | | $61.40 | Yes |
| | $14.95 | No | | $34.75 | Yes |
| | $4.70 | No | | $81.90 | Yes |
| | $7.50 | No | | | |
| | $1.00 | No | | | |
| | $5.13 | No | | | |
| 08/28/2016 | $2.50 | No | 08/28/2016 | $41.49 | Yes |
| | $0.50 | No | | $18.72 | Yes |
| | $16.78 | No | | $53.05 | Yes |
| | $8.60 | No | | $21.55 | Yes |
| | $14.15 | No | | | |
| | $10.59 | No | | | |
| | $20.86 | No | | | |
| | $5.12 | No | | | |
| | $2.00 | * | | | |
| 08/29/2016 | $11.87 | No | 08/29/2016 | $39.06 | Yes |
| | $2.50 | No | | $39.93 | Yes |
| | $14.75 | No | | $21.06 | Yes |
| | $1.00 | No | | $39.79 | Yes |
| | $10.98 | No | | $21.50 | Yes |
| | $7.85 | No | | $40.13 | Yes |
| | $23.42 | No | | | |
| | $30.36 | No | | | |
| | $1.50 | No | | | |

*It is not clear in the video if this $2.00 transaction was in exchange for food or cash, so the Government has countered it as though it was for food.

Throughout his motion, the defendant appears also to conflate the notions of evidence that would tend to exonerate him with evidence that might be relevant to his sentencing.  This evidence surely is relevant to sentence – and it has been disclosed prior to sentencing.  However, the defendant is mistaken in that this evidence is not relevant to sentence because it *helps* him.  The surveillance actually supports a *greater* sentence for the defendant because it demonstrates that the government's loss calculation may be conservative.  The defendant consistently misrepresents the government's position as to the loss in this case.  The government set forth two different ways by which the Court could find a loss range of between $1.5 million and $3.5 million for the defendant's crime.  They have both been described in the Government's Sentencing Reply.  The government did not, "offer an implausible calculation which has as its basis that every transaction over $26.00 is fraudulent," as defendant has repeatedly mischaracterized without correction.  *See* Def. Mot. at 6.  In fact, in its Sentencing Reply, the government stated, "Just as there may have been transactions that were legitimate benefits for food sales in amounts greater than $26, there also were likely transactions of benefits for cash in amounts lower than $26."  *See* Government's Sentencing Reply at 9.

As demonstrated in the defendant's EBT transactions chart above, of the 30 cash for stamp transactions that the defendant completed, 11 of them, totaling $194.70, were in amounts under $26.  However, in support of the defendant's claim, there is a scant single food stamp transaction for actual food in the amount of $30.36.  Given each of these 11 transactions under $26 the Government's loss calculation is likely conservative.

**III.    The defendant points to no evidence by which the Court can conclude the
evidence impeaches one of the government's witness, and is thus not material.**

After his failed claims that the surveillance video contains evidence that would tend to
exculpate the defendant, the defendant proceeds to claim that the evidence impeaches
government witness Mohammad Fayzanali, the son of co-defendant Muhammad Rafiq who
testified as to his and others' food stamp for cash transactions at Corner Groceries.  Before
engaging in this discussion, it is important to note that counsel has made the assertion that the
video shows him "putting money in his pocket on more than one occasions (sic) during the (4)
four days he worked."  Def. Mot. at 4.  The defendant includes no clips, pictures, dates, or times
to support this assertion.  He does not say if it happened twice or twenty times.  As such, the
government has difficulty even assessing the merits of the undescribed evidence.

An investigator has reviewed all four shifts that Fayzanali worked, and has not seen any
evidence of him putting cash in his pocket, or on his person.  During the execution of the search
warrant, a large stack of cash was stored under the counter where the cash register resides,
lending the impression that there is where the clerks generally stored excess cash.  There is
evidence of Fayzanali reaching under the counter, potentially to this location on a few occasions.
It is unclear if he is putting cash there or removing cash from this location, nor is there any
indication that this is anything other than business as usual.  Thus, the government submits that
the Court does not have any evidence to support the defendant's contention.  However, in the
event the government is mistaken or missed some as-yet-identified transactions, even if such
evidence existed, the Court can certainly conclude that such evidence would be cumulative
evidence of Fayzanali's perceived bias, and certainly overwhelmed by the multitude of evidence
in this case.

Counsel correctly recalls some of the general character of Fayzanali's testimony regarding cash.  He testified that, when he worked at the store, customers would constantly ask him whether he would exchange food stamps for cash, and that they would also ask where Rafiq and Shah were.  Eventually, Fayzanali testified as follows:

Q:      Eventually, did you yourself exchange food stamps for cash?

A:      Yes.

Q:      How did you learn how to do it?

A:      I told a customer no, and he pretty much, like, directed me and showed me how to do it.

Q:      Okay.  Tell us how you do it.

A:      So he was, like, "You just got to charge $0, and you keep 20 and then you give me 20."

Q:      Okay.  The first time you did it, the customer actually told you that you could keep 20?

A:      Yes.

Q:      And the first time you did it, what did you do with the 20?

A:      Kept it.

Q:      When you said you kept it, did you keep it for yourself or did you put it in the - -

A:      I put it in my pocket.

Q:      You put it in your pocket.  Then did you do it a few times at first where you kept the money for yourself?

A:      No, just that one time.

Q:      Did you tell your father?

A:      Yes.

Q:      What happened?

> A:      He got mad, and banned me from going to the store.

Exhibit E at 18-19.  Fayzanali continued with his testimony that his father was mad that

Fayzanali had engaged in the transaction at all, and that it was months later that he was allowed

back at the store.  However, Fayzanali testified that he continued the practice when he returned

to the store, but testified:

> Q:      This time, when you did it, what happened to the money that was not the cash that
>
> went out to the customer?
>
> A:      It went in the drawer.
>
> Q:      It stayed in the drawer?
>
> A:      (Witness nods head.)

*Id.* at 20.

The cross examination of Fayzanali lasted a scant two pages of transcript.  Counsel did

not attack Fayzanali's credibility, and instead focused on the perceived dangerousness of the

neighborhood and clientele of the store, as well as the question of who made deposits on behalf

of the store to the bank (presumably an attempt to refute the Government's evidence of massive

amounts of cash withdrawal and deposits from the store's bank account).  *Id.* at 28-29.  Counsel

chose not to attempt to impeach the defendant on the fact that he had been told he would not be

prosecuted for selling food stamps for cash himself.  It is reasonable to think this was a

calculated determination that cross examining a meek 26 year old witness on his credibility

might have backfired.[3]

---

[3] Throughout his testimony, Fayzanali sat slumped behind the desk, at times burying his face in his arms.  In fact, just one question into his testimony, the Clerk told him, "Speak directly into the microphone and clearly.  Your elbow is rubbing on the mic."  *Id.* at 5.  His short answers were said quietly and gave off a clear indication that he did not relish what he was doing.  He agreed with counsel's characterizations that he would rather not testify, that it was not his choice, and that he did not want to be there.  *Id.* at 7.

Evidence is material if there is "a reasonable probability that its disclosure would have produced a different result." *Parker*, 790 F.3d at 558 (quoting *Bartko*, 728 F.3d at 340).  As the Fourth Circuit has made clear:

> "In particular, impeachment evidence may be material when the witness in question 'supplied the only evidence of an essential element of the offense,' especially if the undisclosed evidence was the only significant impeachment material.' . . . . In contrast, impeachment evidence is not material if it is 'cumulative of evidence of bias or partiality already presented and thus would have provided only marginal additional support for the defendant.' *Id. at 558* (quoting *Barkto* 728 F.3d at 339) (internal citation omitted).

Here, any supposed evidence that Fayzanali stole from the store would have some small value, if the defendant could show that he lied.  For one, from what the government has seen, there could be multiple interpretations for what occurred on the video.  Even if there are transactions where Fayzanali put money in his pocket, there could be alternate explanations for it.  It was a cash business partially managed by his father - perhaps he was owed money, or perhaps he was paid in cash for his time.  Perhaps he simply was incorrect in testifying that he only kept a portion of the food stamps for cash transactions for himself on the first occasion.  We do not know.

What we do know is that this line of cross examination would have had little utility.  This case is analogous to *United States v. Cannady*, 719 Fed.Appx. 237, 239-41 (4th Cir. 2018) (unreported).  There, in a per curium opinion, the Fourth Circuit found that the Government's failure to turn over tally sheet contradicting a portion of witness testimony was cumulative impeachment evidence, and undermined witness' credibility on only one point that, standing alone, was of inconclusive impeachment value.  *See id.*  Just as in this case, even if the video showed what counsel claims – and it does not – the impeachment value of the witness putting money in his pocket would be of such inconclusive impact compared to the rest of the testimony

– principally, that the three regular employees exchanged cash for stamps – that it would not

have undermined confidence in the jury's verdict.  See *id*.

**IV.    The Evidence of Mahmood Shah's Guilt was Overwhelming.**

Even if the Court were to find that the testimony of Muhammad Fayzanali was

diminished in some way by the evidence on the surveillance video, the evidence against

Mahmood Shah was overwhelming.  The evidence included the following:

1. A recorded transaction where Shah exchanges cash for food stamps with an undercover agent;
2. Five additional recorded transactions where defendant Rafiq exchanged cash for food stamps with an undercover agent;
3. Testimony from Dwayne Ballard that he exchanged food stamps for cash at the with defendant Shah at Corner Grocery;
4. Testimony from Johnny Clayton that he exchanged food stamps for cash with defendant Shah at the Corner Grocery;
5. Testimony from Ronshay Chisholm that she exchanged food stamps for cash with defendant Shah at the Corner Grocery;
6. Testimony from Charles Edwards that he exchanged food stamps for cash with defendant Shah at the Corner Grocery;
7. Testimony from an USDA investigator, Heber Gordills, that he had exchanged food stamps for cash on two occasions with an unidentified clerk in July 2011;
8. Testimony from USDA Special Agent Wotjkonski that, during the period of time from October 2010 until August 2016, Corner Grocery conducted approximately $2,316,092 in food stamp transactions, which dwarfed both the average of food stamp transactions for similarly-sized stores in the State of Maryland ($145,490) and Baltimore City ($188,454);
9. Testimony from an FBI forensic analyst who demonstrated evidence of both the cash withdrawal and deposit numbers, as well as an analysis of the inventory purchases at Corner Grocery, that could support a jury's conclusion that food stamps were exchanged for cash at the store.
10. A videotaped confession from defendant Shah.

While helpful to the Government, the conviction of the defendant did not turn on the

testimony of Muhammad Fayzanali.  The evidence against defendant Shah was overwhelming,

and would have been the same regardless of Fayzanali's testimony.  Even if the defendant chose

to impeach Fayzanali, and even if he did so successfully, such impeachment would have had no

bearing on the ultimate outcome of the trial.  *See Bartko*, 728 F.3d at 337-40 (*Brady* violations

not material due to the strength of the government's case and the defendant's already extensive impeachment of a key government witness).  Such evidence would have been cumulative of evidence of Fayzanali's perceived bias.  *Id.* (quoting *United States v. Cooper*, 654 F.3d 1104, 1120 (10th Cir. 2011) ("we 'discard as immaterial . . . undisclosed impeachment evidence where it was cumulative of evidence of bias or partiality already presented and would have provided only marginal additional support for [the] defense.").

## CONCLUSION

The defendant's motion is wrong in almost every sense.  The facts demonstrate that there was no suppression to trigger a *Brady* inquiry.  Even if there was such a suppression, the defendant points to no basis by which the Court can conclude the evidence was exculpatory.  The evidence is instead highly incriminating of the defendant.  The defendant argues the video impeaches a government witness but cites to no actual evidence to support this claim.  However, even if there is evidence that it impeached one of the Government's witness, the defendant had a basis to impeach the witness and chose not to.  Finally, the jury had overwhelming evidence beyond that witness' testimony to conclude beyond a reasonable doubt of the defendant's guilt on all charges.  For these reasons, this motion should be denied and Mahmood Shah should proceed to sentencing on January 18, 2019.

Respectfully submitted,

Robert K. Hur
United States Attorney

By:   */s/ Sean R. Delaney*
Sean R. Delaney
Assistant United States Attorney